IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARIA MONTANO,                          )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )        Civil Action No. 15-392-LPS-CJB
                                        )
ALLEN HARIM FOODS, LLC,                 )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

Plaintiff Maria Montano ("Plaintiff") filed this action against her former employer, Defendant Allen Harim Foods, LLC ("Defendant"), alleging violations of the Fair Labor Standards Act of 1938 ("FLSA"), the Delaware Wage Payment and Collection Act ("WPCA"), and asserting breach of contract.  (D.I. 3)  Presently pending before the Court is Defendant's Motion for Summary Judgment ("Motion").  (D.I. 27)  For the reasons set forth below, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.    BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties and the Union

Plaintiff is a resident of the State of Delaware and a former employee of Defendant.  (D.I. 3 at ¶¶ 7, 15; D.I. 28, ex. 1 at 29-30; D.I. 31, ex. 1 at ¶¶ 1-2)  Defendant is a Delaware corporation with its principal place of business in Sussex County, Delaware.  (D.I. 3 at ¶ 8; D.I. 6 at ¶ 8)

---

[1]    In the citations below, where there were exhibits that do not have page numbers, or where it otherwise reduced confusion to do so, the Court has utilized the page numbers generated by the CM/ECF system from the Court's docket.

In February 2009, Plaintiff was hired by Allen Family Foods, Inc.; her work duties
involved processing and boxing poultry and performing related tasks at a Harbeson, Delaware
plant. (D.I. 3 at ¶¶ 12-13; D.I. 31, ex. 1 at ¶¶ 3, 5)  In 2011, the former owner, Allen Family
Foods, Inc. went into bankruptcy, but the plant continued operating, and later in the year, the
plant was purchased by Defendant with no interruption in production. (D.I. 28, ex. 2 at 1)
Plaintiff remained employed at the Harbeson processing plant until her termination in October
2014. (D.I. 31, ex. 1 at ¶¶ 1, 4)

During the entirety of her employment, Plaintiff was represented by United Food &
Commercial Workers Local 27 (the "union"). (D.I. 28, ex. 1 at 30; D.I. 31, ex. 1 at ¶ 6) The
Collective Bargaining Agreements ("CBAs") between the union and Defendant that were in
effect during Plaintiff's employment contained provisions regarding rates of pay and hours of
work. (D.I. 28, ex. 3; id., ex. 4)  The union's most recent CBA with Defendant became effective
on January 26, 2014.  (Id., ex. 4 at AH.00045)[2]

### 2.  Plaintiff's Work and Defendant's Compensation System

During the course of her employment with Defendant, Plaintiff's daily routine was to go
to the locker room, change into work clothes, and walk to her station on the production line.
(D.I. 28, ex. 1 at 30-31)  Plaintiff was required to wear protective gear including an apron, hard
hat, ear plugs, safety glasses, and gloves.  (Id. at 31; D.I. 31, ex. 1 at ¶ 7)  Plaintiff spent
approximately five minutes donning and approximately five minutes doffing her protective gear,
respectively, at the beginning and end of each shift. (D.I. 3 at ¶ 1; D.I. 31, ex. 1 at ¶ 8)

---

[2]      Defendant has negotiated two CBAs with the union since it began operating the
Harbeson plant.  The first became effective September 6, 2011 and the second (most recent)
became effective January 26, 2014. (D.I. 28, ex. 3 at 1, 19; D.I. 28, ex. 4 at AH.00045)

Pursuant to Defendant's longstanding pay practice, Plaintiff was not compensated for "donning and doffing" her protective gear. (D.I. 28, ex. 2 at 1)[3] Instead, Defendant uses a "line time" system to determine compensation—employees are paid only for time spent processing chicken on the production line. (*Id.*, ex. 1 at 32; *id.*, ex. 2 at 1) The start of the line time is fixed each day at 7:54 a.m., when each employee is required to be at their position on the production line. (*Id.*, ex. 1 at 31; D.I. 31, ex. 1 at ¶ 11) The line time ends for an employee each day when the processing is complete and the last chicken has been removed from the line. (D.I. 28, ex. 1 at 32) The end of the line time varies on a daily basis depending on the time when the line is empty. (*Id.*; *id.*, ex. 5 (second column from right))

The shift supervisor records the end of the line time and sends a handwritten data sheet containing that information to Defendant's Human Resources office ("HR"). (*Id.*, ex. 2 at 1) A payroll administrator in HR thereafter enters the line time into Kronos time and attendance software. (*Id.* at 2) The data is then electronically sent to a payroll program, which generates paychecks. (*Id.*)

Plaintiff claims that her paycheck did not reflect the actual amount of hours she worked. She asserts that her check was short by approximately one to five hours on a weekly basis, not only because it did not account for donning and doffing time, but also because, *inter alia*: (1) sometimes, the end of her line time was recorded when poultry hangers stopped working, even though the line work was still active; or (2) sometimes, she would be taken off of the line after her shift ended and be required to process poultry in other areas (or be given other tasks) but

---

[3]     The CBA is silent on whether time spent donning and doffing protective gear is considered compensable time. (D.I. 28, ex. 4 at AH.00049-AH.00052)

would not be paid for this work. (D.I. 31, ex. 1 at ¶¶ 15-19, 22-23, 29)  On several occasions,

Plaintiff brought the discrepancy over her pay to the attention of a supervisor. (D.I. 28, ex. 1 at

8-9; D.I. 31, ex. 1 at ¶ 24)  On the first few occasions, her manager would correct the number of

hours and Plaintiff was in fact paid for the additional time she had worked. (D.I. 31, ex. 1 at ¶

24)  On later occasions, however, her manager dismissed Plaintiff's complaints and refused to

adjust her paycheck. (D.I. 28, ex. 1 at 11; D.I. 31, ex. 1 at ¶¶ 25-26)

In her responses to Defendant's interrogatories, when asked to produce an "itemized

statement" of her claim for unpaid wages, Plaintiff responded that from on or about May 15,

2012 until on or about December 1, 2013, her overtime pay was wrongly reduced by an "average

of 1 hour per week[,]" and that from on or about January 1, 2014 until her termination in October

2014, her overtime was wrongly reduced by an "average of 2.5 hours every week." (D.I. 31, ex.

2 at 6-7)

In her November 2016 deposition, however, when asked about the "one hour per week"

figure she had provided regarding the May 15, 2012 to December 1, 2013 time period, Plaintiff

initially responded that the "days actually don't matter." (D.I. 28, ex. 1 at 10)  She then stated

that in this period, she went unpaid for "less time" than would later be the case; Plaintiff said that

the amount of unpaid overtime in this period "sometimes . . . was an hour and 15, sometimes an

hour and 45, but it was always an hour and some minutes." (*Id.* at 10-11)  When asked about the

January 1, 2014 to October 2014 time frame, in which she had stated that she was unpaid for an

average of 2.5 hours per week, Plaintiff responded that "from the time Chris and Mayra started

[to supervise her] we started missing even more time." (*Id.* at 12)  Plaintiff stated that she did

not keep records of the specific dates on which she claims to have worked without full

compensation. (*Id.* at 8-12)

In an affidavit signed in January 2017, Plaintiff asserts that from the beginning of her employment up through the time in which she began to be supervised by "Chris" and "Mayra," her "check would be short by as little as 1 hour, sometimes 1 hour and 15 minutes; sometimes closer to 2 hours of pay." (D.I. 31, ex. 1 at ¶¶ 22-23; *see also id.*, ex. 2 at 5) In that same affidavit, Plaintiff asserts that after she began working for "Chris" and "Mayra" in or around December 2013, "the amounts taken off my check on a weekly basis varied, but could be as low as 2 ½ hours, to 5 hours." (*Id.*, ex. 1 at ¶ 29; *see also id.*, ex. 2 at 5 (noting that Plaintiff began to work for "Chris" and "M[a]yra" around December 2013))

### 3.     Defendant's Attendance System

Defendant requires employees to clock in and clock out for attendance purposes. (D.I. 28, ex. 2 at 2) The "clock in" and "clock out" entries are not used to determine pay, but rather to ascertain whether an employee came to work late, left early, or was absent. (*Id.*) Defendant's Attendance and Absenteeism Policy ("attendance policy") states that an employee will receive one "occurrence" for an absence and half an "occurrence" for lateness or leaving early. (*Id.*, ex. 6) If an employee exceeds eight occurrences in a calendar year, this will result in termination of employment. (*Id.*)

Under the policy, an absence is considered an occurrence unless it is for hospital admission, bereavement leave, jury duty, military duty, leaves of absence including Family and Medical Leave Act-approved appointments, work authorization renewals, or a subpoenaed court appearance. (*Id.*) The eight-occurrence system, in essence, grants employees eight days each calendar year that may be utilized for time away from work for reasons such as personal illness,

5

certain employee medical appointments and the like.  (*Id.*)  Pursuant to the attendance policy, an

employee is to be given a written warning upon accruing three and six occurrences, respectively.

(*Id.*)

In addition, Defendant provides its employees with a predetermined number of vacation

days each year based on a seniority scale.  (*Id.*, ex. 4 at AH.00055)  Because Plaintiff had

completed four years of continuous service by 2014, she was entitled to two weeks paid vacation

for the 2014 calendar year.  (*Id.*)

### 4.   Plaintiff's Complaints With the Delaware Department of Labor ("DDOL")

In July 2014, according to Plaintiff, conditions at the Harbeson plant had deteriorated,

and so she made a report to the DDOL regarding working conditions at the plant.  (*Id.*, ex. 1 at

21; D.I. 31, ex. 1 at ¶¶ 37-41; *id.*, ex. 3 at 25 (Charge of Discrimination filed by Plaintiff with the

DDOL, which is signed on August 21, 2014, and indicates that Plaintiff initially "presented" her

complaint on July 22, 2014))  This DDOL complaint alleged that Defendant had taken improper

action with regard to Plaintiff's overtime work and overtime pay, that Defendant had

discriminated against Plaintiff due to her race, and that her supervisor had sexually harassed her.

(D.I. 28, ex. 1 at 21; D.I. 31, ex. 1 at ¶¶ 42-47; *id.*, ex. 3 at 25)  Later, on October 2, 2014,

Plaintiff filed a second complaint with the DDOL against Defendant, alleging disability

discrimination and that Defendant had retaliated against her due to the filing of her first

complaint.  (D.I. 31, ex. 3 at 34)

### 5.   Plaintiff's Attendance in 2014 and Events Leading to Plaintiff's Firing

With regard to Plaintiff's attendance during the 2014 calendar year, certain of

6

Defendant's records—more specifically, a document recording a list of Plaintiff's absences that was submitted as Exhibit 9 to Defendant's opening brief—indicate the following:

| Date | Event | Cumulative Occurrences | Warning |
|------|-------|------------------------|---------|
| 1/06/14 | Absent | 1 | |
| 3/04/14 | Absent | 2 | |
| 3/20/14 | Late | 2.5 | |
| 4/29/14 | Absent | 3.5 | |
| 5/02/14 | Late | 4 | |
| 5/20/14 | Late | 4.5 | |
| 5/30/14 | Absent | 5.5 | |
| 7/21/14 | Left Early | 6 | |
| 7/25/14 | | | Warned for accumulating 6 occurrences. |
| 8/22/14 | Left Early | 6.5 | |
| 9/03/14 | Absent | 7.5 | |
| 9/12/14 | | | Warned for accumulating 7.5 occurrences. |
| 10/02/14 | Absent | 8.5 | |
| 10/28/14 | Absent | 9.5 | |
| 10/30/14 | | | Terminated. |

(D.I. 28, exs. 5, 7-9, 12)[4]

---

[4]     Plaintiff's attendance record submitted as Exhibit 9 has been produced with the dates out of chronological order. (D.I. 28, exs. 5, 9)  The table above lists the dates in chronological order with the corresponding accumulation of occurrences.  Defendant describes Exhibit 9 as listing absences that "correlate with the time clock entries (or lack thereof)" shown in Defendant's Exhibit 5 to its opening brief. (D.I. 28 at 5)  In at least a few instances, however,

As is noted in the table above, on July 25, 2014, Plaintiff received (and signed) a written warning, which indicated that she had accumulated six occurrences. (*Id.*, ex. 1 at 16; *id.*, ex. 7) Plaintiff's employment file contains a further written warning dated September 12, 2014 (the "September 12, 2014 warning"), also referenced in the above table, which indicates that Plaintiff had accumulated 7.5 occurrences. (*Id.*, ex. 8) The employee signature line on this September 12, 2014 warning reads "refused to sign[,]" but the warning was signed by an HR representative and a union representative. (*Id.*) Plaintiff contends that she never received nor was aware of the September 12, 2014 warning, and thus, that she did not refuse to sign it. (*Id.*, ex. 1 at 16-17; D.I. 31, ex. 1 at ¶¶ 63-65) Plaintiff states that had she known that Defendant had marked her at 7.5 occurrences, she would not have been absent again thereafter. (D.I. 31, ex. 1 at ¶ 66)

On October 28, 2014, Plaintiff was absent from work, which, according to Defendant, resulted in an accumulation of 9.5 occurrences in her employment file. (D.I. 28, ex. 9 at AH.00131) Plaintiff appeared for work the next day, October 29, 2014, and was thereafter terminated, effective October 30, 2014. (*Id.*, ex. 12)

Plaintiff asserts, however, that she did not rightly accrue 9.5 occurrences. Instead, she claims that some of the occurrences on her employment record were previously approved as vacation days by a supervisor, but were wrongly later marked as unexcused absences. (*Id.*, ex. 1 at 14-15; D.I. 31, ex. 1 at ¶¶ 52-55)

---

it is not clear that this is so. For example, on April 29, 2014, Exhibit 9's list shows Plaintiff as being entirely absent from work, while the clock entries in Exhibit 5 show that she worked for 3.40 hours on that date. (D.I. 28, ex. 5 at 52) On May 2, 2014, Exhibit 9 shows Plaintiff as being late, while Exhibit 5 shows her as clocking in at 7:39 a.m. and leaving early on that date at 1:30 p.m. (*Id.* at 53) And on August 22, 2014, Exhibit 9 lists Plaintiff as leaving early, but Exhibit 5 shows her having worked for 7.90 hours on that date—what appears to be a full day's work. (*Id.* at 55)

More specifically, Plaintiff contends that she was absent from work on three occasions due to appointments with the DDOL related to the complaints she filed with that agency.  (D.I. 28, ex. 1 at 14-15; D.I. 31, ex. 1 at ¶¶ 49, 52)[5]  She asserts that after she showed a letter confirming these appointments to Fred Downs (an HR representative for Defendant), Mr. Downs stated he would count those appointments as vacation days and not as occurrences.  (D.I. 28, ex. 1 at 14-15; *see also* D.I. 31, ex. 1 at ¶ 52 (Plaintiff stating that she "used [her] own time" as to these absences "so that I would not be penalized under the absence policy"))  However, despite this alleged assurance, the DDOL appointments were later marked as occurrences.  (D.I. 28, ex. 1 at 14-15; D.I. 31, ex. 1 at ¶ 70)

Plaintiff further contends that her absence from work on September 3, 2014, should not have resulted in an occurrence.  Plaintiff states that she notified her supervisor "Chris" that she had doctor's appointments on this date.  (D.I. 28, ex. 1 at 51; D.I. 31, ex. 1 at ¶ 53)  In her deposition, Plaintiff said that "Chris" gave her permission to be absent for that day without having to count the day as an occurrence.  (D.I. 28, ex. 1 at 50-51)  In her affidavit, however, Plaintiff states that "Chris" rejected this request, but that it was Mr. Downs who later approved her absence on that day and agreed to count it as an excused vacation day (and not as an occurrence).  (D.I. 31, ex. 1 at ¶¶ 49, 52-55)

## B.    Procedural History

---

[5]    Plaintiff identified the occurrence on August 22, 2014 as being linked to one of the three dates she was away from work because she had an appointment with the DDOL.  (D.I. 28, ex. 1 at 18-19; *id.*, ex. 9 at AH.00130)  Plaintiff was not able to identify with specificity which of the other two occurrences correspond with the remaining two appointments with the DDOL.  (*Id.*, ex. 1 at 20; D.I. 31, ex. 1 at ¶ 49)  However, one of her occurrences took place on October 2, 2014, which is the same date Plaintiff apparently filed her second complaint with the DDOL.  (D.I. 31, ex. 3 at 34)

On May 15, 2015, Plaintiff filed her Complaint, (D.I. 1), which she later amended, (D.I. 3). On January 29, 2016, Chief Judge Leonard P. Stark referred the case to the Court to resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (D.I. 8)

On November 30, 2016, Defendant filed the instant Motion. (D.I. 27) Defendant's Motion was fully briefed as of January 13, 2017. (D.I. 33) A bench trial is scheduled to begin on December 11, 2017. (D.I. 12 at ¶ 16)

## II.     STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party has demonstrated the absence of a genuine dispute of material fact, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks, citation and emphasis omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.   DISCUSSION

Plaintiff's Amended Complaint alleges five claims: (1) violation of Plaintiff's rights under the FLSA for failure to compensate her for overtime worked, specifically relating to failure to count time spent donning and doffing protective gear as compensable time (the "donning and

11

doffing claim"), pursuant to 29 U.S.C. § 207(a) (Count I); (2) violation of Plaintiff's rights under

the FLSA, for otherwise failing to pay her the required overtime wage for each overtime hour

worked, pursuant to 29 U.S.C. § 207(a) (Count I); (3) violation of Plaintiff's rights under the

FLSA for retaliatory discharge of employment, pursuant to 29 U.S.C. § 215(a)(3) (Count II); (4)

violation of Plaintiff's rights under the WPCA, pursuant to Del. Code Ann. tit. 19, §§ 1101-03,

1107 & 1112 (Count III); and (5) breach of contract (Count IV). (D.I. 3 at ¶¶ 45-63; D.I. 28)

With its Motion, Defendant moves for summary judgment on each claim. (D.I. 28 at 1-2) The

Court will take these issues up in turn.

### A.    Plaintiff's Donning and Doffing Claim (Count I)

#### 1.    Background Regarding the FLSA

Congress enacted the FLSA to provide minimum wage and maximum hour standards for

"employees who in any workweek [are] engaged in commerce or in the production of goods for

commerce, or [are] employed in an enterprise engaged in commerce or in the production of

goods for commerce[.]" 29 U.S.C. § 206(a). The FLSA also provides that certain employees

who in any "workweek" work longer than 40 hours must be paid overtime for that work. 29

U.S.C. § 207(a).

Initially, the FLSA did not define the terms "work" and "workweek," an omission which

left the scope of an employee's "work" to the judiciary's interpretation. *See IBP, Inc. v. Alvarez,*

546 U.S. 21, 25-26 (2005). The Supreme Court of the United States later gave those terms a

broad reading, culminating in its holding in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680

(1946) that "the statutory workweek includes all time during which an employee is necessarily

required to be on the employer's premises, on duty or at a prescribed workplace[.]" 328 U.S. at

690-91; *see also IBP, Inc.*, 546 U.S. at 25. The *Anderson* Court also found that "work" included

time employees spent "pursu[ing] certain preliminary activities after arriving at their places of

work, such as putting on aprons and overalls [and] removing shirts[.]" *Anderson*, 328 U.S. at

692-93.

The year after the decision in *Anderson*, and in response to a flood of FLSA litigation,

Congress responded by passing the Portal-to-Portal Act of 1947 ("Portal Act"). The Portal Act

stated that the FLSA had been "interpreted judicially in disregard of long-established customs,

practices, and contracts between employers and employees, thereby creating wholly unexpected

liabilities[.]" 29 U.S.C. § 251(a); *see also IBP, Inc.*, 546 U.S. at 26; *Sepulveda v. Allen Family

Foods, Inc.*, 591 F.3d 209, 217 (4th Cir. 2009). The Portal Act limited the scope of employer

liability for future claims by, *inter alia*, excluding from compensable time "activities which are

preliminary to or postliminary to" the principal activity or activities that an employee is

employed to perform. 29 U.S.C. § 254(a)(2); *see also IBP, Inc.*, 546 U.S. at 27; *Sepulveda*, 591

F.3d at 217.

Subsequent to the Act's passage, the United States Department of Labor ("Department of

Labor") promulgated a regulation stating that changing clothes would normally be considered to

be preliminary or postliminary activity, but that this activity "may in certain situations be so

directly related to the specific work the employee is employed to perform that it would be

regarded as an integral part of the employee's principal activity." 29 C.F.R. § 790.7(g) & n.49

(internal quotation marks omitted); *see also Sandifer v. U.S. Steel Corp.*, 134 S.Ct. 870, 875-76

(2014). The Supreme Court later echoed this Department of Labor regulation by holding that

activities such as donning and doffing protective apparel that are "performed either before or

13

after the regular work shift, on or off the production line, are compensable under the [Portal Act] provisions of the [FLSA] if those activities are an integral and indispensable part of the [employee's] principal activities[.]" *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).

Additionally, in 1949, Congress further amended the FLSA in 29 U.S.C. § 203(o) ("Section 203(o)") to specifically address the act of "changing clothes":

> In determining for the purposes of . . . this title the hours for which an employee is employed, there shall be excluded any time spent in *changing clothes* or washing at the beginning or end of each workday, which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

29 U.S.C. § 203(o) (emphasis added). "Simply put, [this] statute provides that the compensability of time spent changing clothes . . . is a subject appropriately committed to collective bargaining." *Sandifer*, 134 S.Ct. at 876; *see also Sepulveda*, 591 F.3d at 218.

Section 203(o)'s adoption, then, provided for a separate way that changing clothes could be excluded from the calculation of hours worked pursuant to the FLSA. *See Sandifer*, 134 S.Ct. at 876 (noting that "[h]ad the clothes-changing time in this case not been rendered noncompensable pursuant to [Section] 203(o), it would have been a principal activity [pursuant to the meaning of the Portal Act]") (internal quotation marks and citation omitted); *Turner v. City of Phila.*, 262 F.3d 222, 224 (3d Cir. 2001); *see also Steiner*, 350 U.S. at 255 (finding that even if clothes changing and washing is "otherwise [understood to be] a part of the principal activity [pursuant to the Portal Act,]" Section 203(o) "clear[ly] implicat[es] . . . that [it] . . . may be expressly excluded from coverage [for example,] by agreement"); *Sepulveda*, 591 F.3d at 213. In other words: (1) even if the donning and doffing of certain clothing could be said to be an

14

integral and indispensable part of an employee's principal work activities, such that it would ordinarily be included within hours worked under the Portal Act; (2) nevertheless, if pursuant to the meaning of Section 203(o), that time is rendered noncompensable (e.g., if it was excluded from measured working time, either expressly or by custom or practice under a CBA), then an employee need not be paid for that time pursuant to the FLSA. *Sandifer*, 134 S.Ct. at 876; *Turner*, 262 F.3d at 224; *see also Sepulveda*, 591 F.3d at 213.

### 2.   Donning and Doffing Under the Operative CBA

In assessing Defendant's Motion as it relates to Plaintiff's donning and doffing claim, the Court will first assume *arguendo* that Plaintiff's putting on and taking off her protective gear is otherwise compensable under the Portal Act. In other words, the Court assumes that these acts were an "integral and indispensable" part of Plaintiff's principal work activity, and not a "preliminary or postliminary" activity excluded from compensation under the Portal Act. It does so because Defendant's Motion is solely based on the purported applicability of Section 203(o), which, as Defendant notes, provides it with a "separate and independent" avenue for relief. (D.I. 33 at 2)

As to that Section 203(o) defense, where (as here) a CBA governs the relationship between an employer and its employees, then employees will be foreclosed from seeking compensation for donning and doffing if the following are true:  (1) the donning and doffing involves "changing clothes" under the meaning of the statute and (2) donning and doffing was excluded from measured working time by the express terms, or by custom and practice, of a CBA. *Rosano v. Township of Teaneck*, 754 F.3d 177, 193 (3d Cir. 2014). The Court will address both of these factors in turn.

15

First, it is not disputed by the parties that the donning and doffing at issue involves "changing clothes" pursuant to the FLSA. Defendant asserted as much, (D.I. 28 at 7), and Plaintiff did not contest the issue, (D.I. 31 at 7-9). Indeed, Plaintiff's express position is that the time she spent putting on and taking off certain items (her apron, hard hat, glasses, earplugs, and gloves) does in fact amount to "changing clothes"—but that such time should not be excluded from compensation. (*Id.* at 8-9)[6]

As to the second inquiry, the Court must determine whether the donning and doffing of the protective gear in question was excluded from measured working time by the express terms, or by custom and practice, of a CBA.[7] Here there is no dispute that the express terms of the

---

[6]    In *Sandifer*, the Supreme Court addressed the definitions relevant to the phrase "changing clothes" in Section 203(o). *See* 134 S.Ct. at 874. There, the petitioners donned and doffed twelve different types of protective gear at their workplace, including "a hardhat . . . work gloves . . . safety glasses [and] earplugs[.]" *Id.* at 879. The *Sandifer* Court explained that the term "clothes" in the statute denotes "items that are both designed and used to cover the body and are commonly regarded as articles of dress[,]" *id.* at 876-77 (emphasis omitted), and that time spent "changing" clothes includes any time spent in altering dress, *id.* at 879.

As for application of the definition of "clothes" to the facts at issue in that case, the *Sandifer* Court concluded that a hard hat and work gloves met the applicable definition, while glasses and earplugs did not. *Id.* at 879-80. And it left little doubt that a protective apron (of the kind used by Plaintiff here) would also qualify as "clothes." *Id.* Thereafter, it held that if an employee engages in a period of changing into and out of certain items, some of which are "clothes" under Section 203(o)'s meaning and some of which are not, the entire period at issue will be compensable when "the period at issue can, *on the whole*, be fairly characterized as 'time spent in changing clothes[.]'" *Id.* at 881 (emphasis in original, citation omitted); *see also Rosano*, 754 F.3d at 194-95.

Here, again, the Court need not further address whether the time periods at issue amount to time spent "changing clothes," pursuant to the analysis in *Sandifer*. Plaintiff and Defendant both agree that they do.

[7]    At one point in Plaintiff's answering brief, she appears to argue that Section 203(o) only permits employers and employees to exclude donning and doffing protective gear from compensable time pursuant to a CBA if they expressly, mutually discuss the issue and agree

current CBA do not speak to the issue, as nothing in the CBA states that such time is not

compensable (or that it is). (D.I. 28, ex. 4)  Defendant asserts, however, that there is a

longstanding practice at Defendant's processing plant of excluding time spent changing clothes

from compensable time. (D.I. 28 at 7)  And so, the question is whether Defendant can

demonstrate that there is no genuine issue of material fact as to the existence of a "custom or

practice under a bona fide collective-bargaining agreement" of excluding change time from

compensable hours worked. *Turner*, 262 F.3d at 225; *see also Rosano*, 754 F.3d at 193.

The United States Court of Appeals for the Third Circuit has discussed several factors

that have informed the conclusion that donning and doffing time was excluded from measured

working time by custom or practice under a CBA. *Rosano*, 754 F.3d at 193. Those factors have

included that:  (1) the employer had not compensated its employees for change time over a period

of many years; (2) every agreement between the employees and defendant had been silent as to

compensation for change time; (3) the employees had never requested compensation for change

time during any CBA negotiations; and (4) the employees had never filed a grievance or demand

for arbitration based on a lack of compensation for change time. *Id.* (citing *Turner*, 262 F.3d at

---

to do so. (D.I. 31 at 8 ("Section 203(o) . . . allows employers and workers to exclude time for
donning and doffing as compensable time by mutual agreement.") (emphasis in original))
However, the United States Court of Appeals for the Third Circuit has held that "acquiescence to
not being compensated for changing time can constitute a custom or practice . . . for the purposes
of [Section] 203(o)." *Turner*, 262 F.3d at 225 (internal quotation marks and citation omitted). In
doing so, it rejected the argument that an issue of compensability must be specifically raised in
formal collective bargaining negotiations, and then dropped by the negotiators, in order for it to
be said that the failure to compensate such activity has become a custom or practice. *Id.* at 226
(noting that the Third Circuit views the phrase "custom or practice under a bona-fide collective-
bargaining agreement" in Section 203(o) as "simply restating the well-established principle of
labor law that a particular custom or practice can become an implied term of a labor agreement
through a prolonged period of acquiescence").

224-27).

In addition to recognizing these guideposts from the Third Circuit, the Court also notes the United States Court of Appeals for the Fourth Circuit's decision in *Sepulveda*. While this decision is not binding on the Court, its legal analysis is particularly instructive here, as in that case, the Fourth Circuit was confronting the issue of compensability for donning and doffing protective gear as it applied to the very same processing plant that is at issue in this matter. *Sepulveda*, 591 F.3d at 212. In considering the pay practice of the former owner of the processing plant (Allen Family Foods, Inc.), the Fourth Circuit found that while the donning and doffing of protective gear by employees at the Harbeson plant constituted "changing clothes" within the meaning of Section 203(o), "[t]he company's practice of paying the employees on a line time basis is longstanding." *Id.* at 214 (internal quotation marks omitted). The Fourth Circuit also noted that in 2002, the union (that is, the same union who represents Plaintiff here—United Food & Commercial Workers Local 27) had proposed that its members should be paid for 12 minutes of donning and doffing time per day, but that the company and the union did not ultimately agree to that proposal. *Id.* at 212. Thus, the "long-standing practice" of paying on the basis of line time continued, and existed up until the date of that suit, which was filed in January 2007. *Id.* at 212, 214. All of this compelled the Fourth Circuit's conclusion that the donning and doffing activity in question was not compensable pursuant to Section 203(o). *Id.* at 214.

Here, the Court concludes that there is no genuine dispute of material fact that Defendant had a longstanding practice of not compensating its employees for change time under the relevant CBAs. With regard to the factors that the Third Circuit has utilized in this analysis:

18

(1)  Defendant purchased the Harbeson processing plant in 2011 and continued the same pay practice instituted by the previous owner, (D.I. 28, ex. 2 at 2), which had, in turn, been in place for many years.  Throughout the time since Defendant purchased the business from Allen Family Foods, Inc., Defendant (like its predecessor) never compensated its employees for donning and doffing of protective gear.  (*Id.*, ex. 2 at 1)

(2)  Further, Defendant has negotiated two CBAs with the union since its acquisition of the processing plant, (*Id.*, ex. 3 at 1; *id.*, ex. 4 at AH.00045), and (even with the *Sepulveda* decision in the background) both CBAs have been silent as to whether time spent donning and doffing protective gear is compensable.

(3)  There is no evidence in the record to suggest that since Defendant acquired the business, members of Plaintiff's union have requested compensation for such time during CBA negotiations.

(4)  There is no evidence in the record to suggest that any union members ever filed a grievance with Defendant, or demanded arbitration, based on Defendant's failure to compensate for the time.

This record strongly supports Defendant's position, and provides no reason to deviate from the conclusion of the *Sepulveda* Court as to a very similar issue.  In light of this, summary judgment is appropriate on this claim.

**B.     Plaintiff's Unpaid Overtime/"Time Shaving" Claim (Count I)**

Next, the Court addresses Defendant's Motion as it otherwise relates to Plaintiff's claim for allegedly unpaid overtime work (or "time shaving"), specifically for:  (1) time when she continued to process chicken after poultry hangers had stopped working, but while her line work was still active; and/or (2) time when she worked in other areas processing poultry after her shift ended.  (D.I. 28, ex. 1 at 33; D.I. 31, ex. 1 at ¶¶ 15-18)  Defendant's Motion, as it relates to this claim, focuses on Plaintiff's alleged inability to sufficiently prove the amount and extent of the uncompensated overtime work she performed.

The FLSA mandates that "[e]very employer subject to any provision of this chapter . . . shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him[.]" 29 U.S.C. § 211(c). The Supreme Court has outlined the burdens placed upon the employer and employee as to proof of a valid claim for unpaid compensation under the FLSA. *See Anderson*, 328 U.S. at 686-87.[8] When the employer has kept "proper and accurate records[,]" then the employee can "easily" discharge her burden of proving that she performed the work for which she was not properly compensated by "securing the production of those records." *Id.* at 687. But, when the employer's records are "inaccurate or inadequate[,]" then an employee can meet her burden if she "proves that [s]he has in fact performed work for which [s]he was improperly compensated and if [s]he produces sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference." *Id.* If she does this, then the burden shifts to the employer to come forward with "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

In this case, Defendant has produced a printout from its payroll system, generated from its Kronos time and attendance software, which shows the date of Plaintiff's work, Plaintiff's "clock in" time, Plaintiff's "clock out" time, and Plaintiff's total amount of line time for each day Plaintiff worked (with any "overtime" designated by any amount of line time hours exceeding 40

---

[8]     While *Anderson* has been superseded by statute on other grounds, it remains valid precedent concerning the burden-shifting analysis for proving unpaid time worked.

hours per week). (D.I. 28, ex. 2 at 1-2; *id.*, ex. 5 (second column from the right))  Further it is

undisputed that each work day, the start of line time was fixed at 7:54 a.m.  (*Id.*, ex. 1 at 31; *id.*,

ex. 2 at 1; D.I. 31, ex. 1 at ¶ 11)  Each day, a department supervisor recorded the end of line time

on a handwritten data sheet submitted to Defendant's HR office; the HR office, in turn, used

those data sheets to input the total amount of line time for each employee into the Kronos

software program.  (D.I. 28, ex. 2 at 1-2; D.I. 31, ex. 1 at ¶ 15)  Defendant has not produced, and

apparently no longer has, the data sheets that were used to input the end of line time into the

Kronos system.  (D.I. 33 at 3)

> Plaintiff contends that Defendant's payroll records are "inaccurate or inadequate" under

the meaning of *Anderson*.  She asserts this is so for two reasons.

> First, she argues that the records are inadequate because Defendant has not produced the

data sheets that documented the end of line time for each day.  (D.I. 31 at 2, 11, 12)  Yet the

Court cannot find that Defendant's failure to produce these documents, *in and of itself,*

necessarily means that Defendant has produced "inaccurate or inadequate" records.  After all, the

Department of Labor's regulations simply require employers to record, as relevant here:  "[h]ours

worked each workday and total hours worked each workweek[.]"  29 C.F.R. § 516.2(a)(7).  The

employer is not required to retain the raw, underlying (in this case, handwritten) records that are

utilized to generate the separate recitation of "hours worked"; rather, the regulations permit an

employer to maintain record of hours worked on "data processing memory[.]"  29 C.F.R. §

516.1(a) (also noting that "[n]o particular form of record is prescribed" by the regulations); *cf.*

*Bettger v. Crossmark, Inc.*, Civil Action No. 1:13-CV-2030, 2014 WL 2738536, at *9 (M.D. Pa.

June 17, 2014).

Plaintiff's second argument—that Defendant's time records are "inaccurate" under the meaning of *Anderson*—is different. Here, Plaintiff's contention is that Defendant's payroll records are simply *wrong*—in that the amount of line time recorded thereon is intentionally under-inclusive, and does not include certain additional time that Plaintiff actually worked. (D.I. 31 at 11-12) This happened because, according to Plaintiff, Defendant was engaging in a "scheme where [either] supervisors did not record the appropriate end of the line time for purposes of compensability" or "where the Human Resources staff [did] not properly enter the time in the Kronos system." (*Id.* at 12) As Plaintiff has articulated a clear reason why Defendant's records are said to be inaccurate—an assertion supported at least by her own testimony—the Court concludes that the *Anderson* burden-shifting test associated with "inadequate or inaccurate" records should apply here. *See Perez v. Pinon Mgmt., Inc.*, Civil Action No. 12-cv-00653-RM-MEH, 2014 WL 5596261, at *7 (D. Colo. Nov. 4, 2014) (assuming that a defendant's time and payroll records were inaccurate or inadequate under the meaning of *Anderson*, where the court was obligated to take the facts in the light most favorable to the plaintiff, and where the plaintiff had contested the accuracy of those records); *cf. DiSantis v. Morgan Props. Payroll Servs., Inc.*, Civil Action No. 09-6153, 2010 WL 3606267, at *13 (E.D. Pa. Sept. 16, 2010) (finding that the plaintiff had not convinced the court that the defendant's records were inaccurate or inadequate under *Anderson*, but in a case where the plaintiff had been unable to specify why the records were incomplete, and where the plaintiff had, in the main, failed to direct the court to any specific problems with defendant's records).

Thus, in order to meet her initial burden, Plaintiff would need to demonstrate not only that she "has in fact performed work" for which she was improperly compensated, but also must

produce "sufficient evidence to show the amount and extent of the work as a matter of just and

reasonable inference." *Anderson*, 328 U.S. at 687. Defendant's sole basis for seeking summary

judgment as to this claim is that Plaintiff cannot satisfy the latter requirement—that Plaintiff has

not sufficiently demonstrated the "amount and extent of the work" at issue as a matter of "just

and reasonable inference." This is so, according to Defendant, because Plaintiff has "offered

only vague and unsubstantiated estimates of her alleged unpaid time." (D.I. 28 at 8)

There is no question that Plaintiff cannot recall specific dates/weeks on which she worked

specific amounts of uncredited overtime. In other words, Plaintiff is not now in a position to say,

for example, "During the week of August 18, 2014, I worked 3.25 hours of uncredited overtime,

and I have contemporaneous notes from each of the days during that week that substantiate the

amount of unpaid overtime worked for each day of the week, which together total 3.25 hours."

(D.I. 28, ex. 1 at 8) But unsurprisingly, that kind of precision is not required at this stage. *See,*

*e.g., Rong Chen v. Century Buffet & Rest.*, Civil Action No. 09-1687 (SRC), 2012 WL 113539,

at *7 (D.N.J. Jan. 12, 2012).

Instead, a plaintiff can make the requisite showing, even relying solely on her own

testimony, *id.*, so long as in articulating the "amount and extent of the work" at issue, she can

"'offer[] credible testimony *approximating* the number of hours [she] worked without pay[,]'"

*DiSantis*, 2010 WL 3606267, at *14 (certain emphasis in original) (quoting *Kolesnikow v.*

*Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 119 (S.D.N.Y. May 20, 2009)). On the other

hand, courts have found that if all the plaintiff provides are vague and unsubstantiated estimates

of the amount of time worked, that is insufficient to satisfy this burden of proof. *See DiSantis*,

2010 WL 3606267, at *13 (finding that the plaintiff had failed to produce sufficient evidence to

23

meet this burden, because she "relies solely on vague, conclusory, and speculative testimony to support her [FLSA] claim that she often worked more than 40 hours in weeks of her employment" and where the plaintiff at times could assert only that she "sometimes" or "pretty much every week" or "almost every week" worked uncompensated hours, and at other times said she had "no idea" as to how much overtime she worked) (certain emphasis, internal quotation marks and citations omitted). Put differently, where plaintiffs have provided a *sufficiently reliable metric* through which the Court could substantiate and calculate the amount of their claims for unpaid wages, courts have found that they have met their burden; where they have been unable to provide such a metric, summary judgment has been granted to the defendant.[9]

Plaintiff's interrogatory responses on this question, standing alone, would surely have sufficed to meet this burden. There, Plaintiff broke out two distinct time frames in which the amount of her uncredited hours differed, and provided an average number of hours per week of

---

[9]   *Compare Park v. Seoul Broad. Sys. Co.*, No. 05 CV 8956(BSJ)(DFE), 2008 WL 619034, at *3, *7 (S.D.N.Y. Mar. 6, 2008) (finding that plaintiff had met this burden at the summary judgment stage where, *inter alia*, he submitted deposition testimony in which he identified specific dates and times when he had worked unpaid overtime, or provided examples of specific work events in certain time frames as to which he had completed overtime work, and where he submitted the supporting declaration of a co-worker), *and Rivera v. Ndola Pharm. Corp.*, 497 F. Supp. 2d 381, 389-90 (E.D.N.Y. 2007) (finding that plaintiff had met this burden where she testified that in certain defined time frames she worked a consistent amount of overtime, where she identified those relevant time frames and overtime amounts with specificity, and where she also produced the affidavit of a co-worker that provided support for some of her claims of overtime worked); *with Kolesnikow*, 622 F. Supp. 2d at 118-19 (finding that plaintiff had failed to meet this burden on summary judgment, where she could testify only that "two to four weeks per month, she worked un unspecified amount of time over 40 hours per week[,]" that she "'sometimes'" worked through her lunch break once a week, and that "she worked an unspecified amount of time past the end of her shift two or more times per week"), *and Simmons v. Wal-Mart Assocs., Inc.*, No. 2:04-CV-51, 2005 WL 1684002, at *10 (S.D. Ohio July 19, 2005) (finding that a plaintiff who "fails to identify a single specific day" on which uncompensated work was performed, and who relied on the "bald assertion that from 1999 to 2003 he worked off the clock over 200 times on unspecified days" could not survive summary judgment).

uncredited hours: that from about May 15, 2012 until December 1, 2013, her overtime pay was reduced by an average of one hour per week, and that from about January 1, 2014 (i.e., when she began to be supervised by "Chris" and M[a]yra") until her termination in late October 2014, her overtime pay was reduced by an average of 2.5 hours per week. (D.I. 31, ex. 2 at 5-7) Things got a little murkier during Plaintiff's deposition. For example, when asked about the first of these two time frames, and whether the stated "average of one hour per week" for that time frame was accurate, Plaintiff initially responded "[t]he days actually don't matter [because] it happened all the time." (D.I. 28, ex. 1 at 10) Plaintiff quickly added, though, that in this time frame, some weeks she had been shorted "an hour and 15 [minutes per week], sometimes an hour and 45, but it was always an hour and some minutes." (*Id.* at 11) Then, in her post-deposition affidavit, Plaintiff provided a little more clarity. She wrote that prior to being supervised by "Chris" and "Mayra" (i.e., post-December 2013) she was shorted 1-2 hours per week, and after "Chris" and "Mayra" began to supervise her, she was shorted between 2.5 to 5 hours per week. (D.I. 31, ex. 1 at ¶¶ 22-23, 29)

These submissions admittedly do not provide perfect clarity. But in *Anderson*, the Supreme Court did not require this of someone in Plaintiff's shoes. Plaintiff's statements, in the Court's view, provide at least "sufficient evidence to show the amount and extent of the [unpaid overtime] work" at issue as a "matter of just and reasonable inference." The statements are, after all, fairly consistent in their assertion that from at least May 2012 to December 2013, Plaintiff lost an average of between 1-2 overtime hours per week, and that from January 2014 to her termination in October 2014, she lost between 2.5 and 5 hours of overtime hours per week. If Plaintiff can sufficiently demonstrate at trial (through her own testimony, Defendant's payroll

25

records and otherwise) that there are weeks in these respective time frames in which she surely
worked more than 40 hours per week in total, then this testimony could provide the fact finder
with a sufficiently reliable metric to then allocate the number of unpaid overtime hours worked in
that week. *Cf. Alston v. DIRECTV, Inc.*, — F. Supp. 3d, 2017 WL 2311588, at *16-17 & n.12
(D.S.C. May 26, 2017) (finding that plaintiffs met the "just and reasonable inference" standard
where their interrogatory answers "set forth the estimated number of workweeks and estimated
number of hours [of unpaid overtime] within each workweek that each of them recollects[,]"
even where this evidence conflicted in some way with portions of Plaintiff's deposition
testimony); *Rong Chen*, 2012 WL 113539, at *1-2, *7 (finding that plaintiffs met the "just and
reasonable inference" standard by testifying that they "regularly worked 11 to 12 hours . . . six
days per week, totaling a minimum of 68 hours worked weekly" over a nearly five-year period).

Therefore, Plaintiff has met her initial burden under *Anderson* in this regard. Because
her asserted failure to do so was the only reason cited by Defendant as to why the Motion should
be granted as to this claim, the Court recommends that Defendant's Motion be denied as to the
claim.

C.     **Plaintiff's FLSA Retaliation Claim (Count II)**

Plaintiff next contends that she was dismissed from her position in retaliation for, *inter
alia*, the complaints she filed with the DDOL concerning the conditions of her employment.
(D.I. 3 at ¶¶ 42, 49-51)  The FLSA prohibits the discharge of any employee who, *inter alia*, "has
filed any complaint or instituted or caused to be instituted any proceeding under or related to this
chapter" against an employer.  29 U.S.C. § 215(a)(3).

In determining whether unlawful retaliation under this provision has occurred, this claim

26

is subject to the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x. 94, 95 (3d Cir. 2002); *Parker v. 4247 FX, Inc.*, CIVIL ACTION NO. 16-2710, 2017 WL 2002794, at *8 (E.D. Pa. May 12, 2017). Under this analysis, Plaintiff must first establish a *prima facie* case of retaliation. *Parry v. New Dominion Const., Inc.*, No. 14cv1115, 2015 WL 540155, at *6 (W.D. Pa. Feb. 10, 2015). The burden then shifts to Defendant to offer a legitimate and non-retaliatory reason for Plaintiff's discharge. *Id.* If Defendant meets that burden, Plaintiff must prove that the articulated reason for discharge is a pretext for retaliation. *Id.*

To establish a *prima facie* case of retaliation, Plaintiff must show:  (1) that she engaged in an activity protected by the FLSA; (2) that she suffered a materially adverse action that might dissuade a reasonable worker from making or supporting an FLSA claim; and (3) that a casual link exists between the protected activity and the discharge. *Id.*; *see also Dougherty v. Ciber, Inc.*, No. Civ.A.1:04-CV-1682, 2005 WL 2030473, at *2 (M.D. Pa. July 26, 2005). Here, Plaintiff has demonstrated that she engaged in a protected activity, considering that it is undisputed that:  (1) in July 2014, prior to her termination, she had, *inter alia*, reported to the DDOL allegedly abusive conditions in the workplace (including complaints regarding overtime); (2) she filed a formal complaint on these grounds with the DDOL in August 2014 (and another on other, somewhat-related grounds, in October 2014); and (3) Defendant was aware of these complaints. *See Reilly v. Quick Care Med., P.C.*, Civil Action No. 14-342 (JBS/AMD), 2014 WL 2571642, at *2-3 (D.N.J. June 9, 2014) (citing cases); *see also* (D.I. 28, ex. 1 at 21; D.I. 31, ex. 1 at ¶¶ 37-42; *id.*, ex. 3 at 25, 34). She has also demonstrated that she suffered an adverse employment action on October 30, 2014 (her firing), which came subsequent to her filing of the

DDOL complaints.

As for the requisite causal link, the proximity of Plaintiff's filing of her DDOL complaints to her termination can certainly be a factor that helps establish such a nexus. Even if that proximity, on its own, is not enough to satisfy the nexus requirement, *see, e.g.*, *Zielinski v. City of Wildwood*, Civil No. 12-7195(JS), 2014 WL 6991388, at *5 (D.N.J. Dec. 10, 2014), Plaintiff may also rely upon a "broad array of [other] evidence" to make out this link, *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). And here, Plaintiff's allegation is that as a result of filing the DDOL complaints, she needed to take at least portions of three days off in order to attend appointments with DDOL representatives. (D.I. 28, ex. 1 at 14-15; D.I. 31, ex. 1 at ¶ 49) There is, in turn, a fact dispute about whether Defendant agreed not to count these three absences as "occurrences" under Defendant's attendance policy. Plaintiff says Defendant agreed not to do so; Defendant disagrees, and has counted these absences as occurrences. (D.I. 28, ex. 1 at 14-15, 19; D.I. 31, ex. 1 at ¶ 52) And but for these three instances being registered as occurrences under the attendance policy, Plaintiff would not have had the requisite number of absences to warrant termination pursuant to that policy.

In other words, there is a real nexus here between: (1) certain acts Plaintiff took that were protected activity under the FLSA (leaving work to follow through on her DDOL complaints); and (2) the very reason Defendant provides for her firing. It is that interrelationship that, in turn, has led to Plaintiff's assertion that "Defendant engaged in marking some of Plaintiff's absences as 'occurrences' under the [attendance] policy so as to make it appear as though her termination was justified when in fact, her termination was retaliatory [in light of] the claims she filed against the Defendant [with the DDOL]." (D.I. 31 at 4) These facts, viewed in the light most favorable

28

to the Plaintiff, are sufficient to make out the requisite causal link. Thus, the Court finds Plaintiff

has established a *prima facie* case of retaliation.

Defendant, next, is required to respond by citing a legitimate, non-retaliatory reason for

Plaintiff's firing. And here, it has—that Plaintiff exceeded eight occurrences under the

attendance policy and was terminated as a result. (D.I. 28 at 9); *see also Zielinski*, 2014 WL

6991388, at *7 (finding, in an FLSA case, that an employer's assertion that the plaintiff was fired

for violating a company policy regarding excessive lateness amounted to provision of a

legitimate, non-discriminatory explanation).

The burden then shifts back to Plaintiff to show that the proffered legitimate reason is in

fact a pretext for retaliation. *See Wildi v. Alle-Kiski Med. Ctr.*, 659 F. Supp. 2d 640, 668 (W.D.

Pa. 2009) (noting that in order to create a genuine issue of material fact with respect to pretext, a

plaintiff in an FLSA case must point to some evidence from which a fact finder could either "(1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that a discriminatory

reason was more likely than not a motivating or determinative cause of the employer's action")

(quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). The facts discussed above relating

to the required "casual link" are also surely relevant to the "pretext" inquiry. And there are other

disputes of fact that are relevant as well. Plaintiff contends, for example, that (1) one of

Defendant's employees told her that her September 3, 2014 absence would not count against her

total number of occurrences, and yet Defendant ultimately did register this as an occurrence[10];

---

[10]     As Defendant points out, (D.I. 33 at 5-6), some portion of the record relating to
Plaintiff's assertions regarding the September 3, 2014 absence is not helpful to Plaintiff. For
example, Plaintiff claims that she took this leave so that she could attend various doctor's
appointments, (D.I. 31, ex. 1 at ¶ 53), but Defendant's attendance policy states that if an
employee is out of work due to a medical appointment, that is supposed to be treated as an

and (2) Defendant falsely indicated that Plaintiff refused to sign the September 12, 2014 warning, when in fact Plaintiff was never presented with the warning in the first place.[11] To be sure, Defendant denies Plaintiff's allegations. But at the summary judgment stage, the Court cannot make credibility determinations. If Plaintiffs allegations here are credited, then they would further support Plaintiff's claim that Defendant manufactured a reason to justify Plaintiff's termination, at the same time as (and in direct response to) the pendency of Plaintiff's DDOL complaints.

Thus, Plaintiff has demonstrated a genuine issue of material fact as to whether she can prevail on her FLSA retaliation claim. Therefore, the Court recommends that summary judgment be denied as to this claim.

---

occurrence, (D.I. 28, ex. 6 at AH.00205). Additionally, in Plaintiff's deposition, she claimed that her supervisor "Chris" approved this absence (and said it would not count as an occurrence), while in her affidavit, she says that an HR representative (Mr. Downs) is the one who made this representation. *See infra* Section I.A.5. In the Court's view, however, while this all provides fodder for cross-examination of Plaintiff at trial, it does not serve to eliminate a material factual dispute. It seems plausible, for example, that an HR representative might have the ability to override the express terms of the attendance policy in a particular instance. And even if such a representative did not actually have that power, were (1) that person to have intentionally (and falsely) *led Plaintiff to believe* that an absence would not count as an occurrence; and then (2) Plaintiff absented herself from work as a result, only to learn later that this representation was false, and was being used against her by Defendant to justify her termination; then (3) it is plausible that this conduct could be seen as part of an unlawful retaliation scheme.

[11]     Defendant notes that pursuant to its attendance policy, there was no requirement for it to have given Plaintiff a warning on September 12, 2014. (D.I. 33 at 6-7) That is because this warning is said to have been provided at the point where Plaintiff reached 7.5 occurrences, while the attendance policy only requires a warning when Plaintiff obtains 3 and 6 occurrences, respectively. (*Id.*) But that misses the point. If it is true, as Plaintiff suggests, that Defendant's employee falsely wrote that Plaintiff had been shown the warning and refused to sign it—when in fact Plaintiff had never seen the warning—then the falsity of that representation would be another factor suggesting ill motive on Defendant's part regarding the events leading to Plaintiff's termination.

### D.    Plaintiff's WPCA Claim (Count III)

The WPCA allows for a Delaware state cause of action to allow a person to "recover unpaid wages[.]" 19 Del. C. § 1113(a). The statute defines "wages" to mean "compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation[.]" 19 Del C. § 1101(a)(5). The parties agree here that Plaintiff's dispute with Defendant over unpaid time is a dispute about "wages" under the WPCA—that is, a dispute over compensation for labor or services fixed due to an "other basis of calculation." (D.I. 28 at 9; D.I. 31 at 14)

In its opening brief, Defendant was clear that it was seeking summary judgment on the entirety of Plaintiff's WPCA claim in Count III of the operative complaint. (D.I. 28 at 9) It also indicated its belief that the substance of this WPCA claim amounted to two types of allegations: (1) that Plaintiff should have been compensated for the same "donning and doffing" time that is at issue in her FLSA claim in Count I; and (2) that Plaintiff should otherwise have been compensated for overtime that was inappropriately "shaved"—allegations also at issue in her FLSA claim in Count I. (*Id.* at 9) In her answering brief, in turn, Plaintiff appeared to confirm that any WPCA claim she was pressing via Count III is limited to the aforementioned "donning and doffing" allegations and "time shaving" allegations. (D.I. 31 at 15) Moreover, Plaintiff indicated that the substance of her WPCA claim is entirely co-extensive with the arguments she made as to her FLSA claim in Count I. (*Id.*) ("Plaintiff posits that donning and doffing time is compensable under the FLSA, *and as such*, is also compensable under the [WPCA]. Additionally, any regular and overtime pay that was due to [Plaintiff] (whether as a result of not counting donning and doffing, or whether [her] employer specifically reduced employees'

31

overtime pay in other contexts) is *also compensable* under the [WPCA].") (emphasis added))  In

other words, Plaintiff made no argument that the WPCA's protections were "greater . . . than

federal law" in this case.  (D.I. 33 at 7)

Here, as noted above, the Court has recommended that summary judgment be granted as

to the FLSA donning and doffing claim in Count I.  Thus, Plaintiff's identical claim under the

WPCA must fall too.  Although the Court has not recommended that summary judgment be

granted as to the other aspects of the FLSA overtime shaving claim in Count I, because

Plaintiff's WPCA claim as to overtime shaving is entirely coextensive with her FLSA claim, the

WPCA claim is preempted.  *See Nimmons v. RBC Ins. Holdings (USA) Inc.*, Civil Action No.

6:07–cv–2637, 2007 WL 4571179, at *1-2 (D.S.C. Dec. 27, 2007) (dismissing a portion of

plaintiff's claim made pursuant to the South Carolina Wage Payment Act because it was

duplicative of plaintiff's claim for failure to pay overtime wages under the FLSA); *see also*

*Zanders v. Wells Fargo Bank N.A.*, 55 F. Supp. 3d 1163, 1176 (S.D. Iowa 2014); *Bowen v.*

*Darby Dev. Co., Inc.*, Civil Action No. 2:10–2509–RMG–BM, 2012 WL 2675323, at *16

(D.S.C. April 26, 2012); *Martinez-Hernandez v. Butterball, LLC*, 578 F. Supp. 2d 816, 819

(E.D.N.C. 2008).

Therefore, the Court recommends that summary judgment be granted as to the entirety of

Plaintiff's WPCA claim in Count III.

**E.     Plaintiff's Breach of Contract Claim (Count IV)**

Plaintiff's claim in Count IV of the operative complaint alleges that Defendant breached

an employment contract with her by failing to pay Plaintiff for all compensable time under the

FLSA.  (D.I. 3 at ¶¶ 58-63)

Defendant asserts that there is not and could not be any contract between Plaintiff and Defendant. (D.I. 28 at 9-10; D.I. 33 at 7)  This is because federal labor law dictates that a bargaining unit employee is precluded from entering into an individual contract with an employer, unless the CBA so provides for such a contract. *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967) (finding "only the union may contract with employee's terms and conditions of employment"); *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1536 (3d Cir. 1992) (employer "could bargain only with the union and not with the individual employees").  The CBA at issue here does not.  Thus, the Court does not understand (and Plaintiff has not explained)[12] how Defendant can have a breachable employment contract with Plaintiff. *See NLRB*, 388 U.S. at 180 (national labor law "extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interest of all employees").

For these reasons, the Court recommends that summary judgment be granted as to Count

---

[12]    At times, Plaintiff appears to argue that to the extent that the union failed to negotiate a CBA that provided for compensation of donning and doffing time, then such CBA is "null and void" and "violates public policy [such that it] is not valid or enforceable." (D.I. 31 at 17; *see also id.* (citing *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953) for the proposition that a bargaining representative may bind its union members but only so long as the representative demonstrates "'good faith and honesty of purpose in the exercise of its discretion'"))  But the Court does not see how any such failure of the union could have this effect.  After all, federal law—that is, Section 203(o) of the FLSA—expressly permits collective bargaining as to whether time spent donning and doffing protective gear need be compensated by the employer (and thus, underscores that such time may, or may not, end up being rightly compensable as a result of such negotiations).  (D.I. 33 at 7); *see also Sandifer*, 134 S.Ct. at 879 ("The object of [Section] 203(o) is to permit collective bargaining over the compensability of clothes-changing time and to promote the predictability achieved through mutually beneficial negotiation."); *Sepulveda*, 591 F.3d at 219 ("We stress that our decision does not leave these employees without protection.  It simply recognizes that Congress has made a policy choice that, when it comes to time spent changing clothes and washing, the respective interests involved are best protected through the collective-bargaining process and the agreements negotiated pursuant thereto.").

IV.

## IV.    CONCLUSION

For the reasons set forth above, the Court recommends that Defendant's Motion be

GRANTED-IN-PART and DENIED-IN-PART.  More specifically, the Court recommends that

the Motion be DENIED as to the portion of Count I of the Amended Complaint that deals solely

with Plaintiff's overtime shaving allegations, and as to Count II in its entirety.  The Court

recommends that the Motion be GRANTED in all other respects.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1) and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924,

925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).


Dated: August 4, 2017                        _____

                                             Christopher J. Burke
                                             UNITED STATES MAGISTRATE JUDGE